UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MELISSA B., Plaintiff, v. COMMISSIONER OF SOCIAL SECURITY, Defendant. | : | 23-CV-1494 (SFR) |

**MEMORANDUM & ORDER**

Plaintiff Melissa B.[1] seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability and supplemental security income benefits under Title II and Title XVI of the Social Security Act. Before me is a motion from Plaintiff seeking an order reversing the decision of the Commissioner and awarding disability benefits, Pl.'s Mot. To Rev., ECF No. 19 ("Pl.'s Mem."), and a motion from the Commissioner seeking to affirm the Commissioner's decision, Mot. Aff. Decision of the Comm'r 1, ECF No. 21. The Commissioner's motion was accompanied by a memorandum in support, ECF No. 21-1 ("Comm'r Mem.").

For the reasons set forth below, Plaintiff's Motion to Reverse the Commissioner is GRANTED and the Commissioner's Motion to Affirm is DENIED.

[1] Pursuant to this Court's January 8, 2021, Standing Order, Plaintiff is identified by her first name and last initial or as "Plaintiff" throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021). The Defendant will be identified as the "Commissioner."

# I. BACKGROUND

## A. Factual Background

I assume familiarity with Plaintiff's medical history, as summarized in the Commissioner's Statement of Material Facts, ECF No. 21-2. I note that Plaintiff has not expressed whether she objects to this fact summary, but Plaintiff's motion to reverse does not appear to dispute any facts—only the findings drawn by the ALJ based on those facts. I include additional facts below relevant to resolving the motions before me.

### 1. Hearing

At Plaintiff's social security hearing, Plaintiff testified that she has to "sit down after every, . . . ten steps" and suffers from asthma. R. 81; *see also* R. 92, 97.[2] She further testified that she can only sit comfortably for approximately fifteen minutes at a time. R. 92.

With regard to her psychological symptoms, Plaintiff explained that she "ha[s] issues with hearing voices, seeing things that are not present . . . multiple times throughout the day." R. 85. Plaintiff said that "[e]ven sometimes when [she is] on the phone, [she] could hear other voices in the middle of the conversation that constricts [her] from concentrating." R. 85. By way of example, she said that the day before the hearing, she "thought somebody was behind [her]," and saw a "big black shadow," but it was only just her fan. R. 89. The voices she hears "are more like radio" and she hears them "at least once a day." R. 89; *see also* R. 89 (stating that she hears and sees things that are not there "[e]very day, or in the night").

[2] Citations to the administrative record, ECF No. 13, appear as "R." followed by the page number appearing in the bottom right-hand corner of the record.

Plaintiff said that her "concentration has been very poor." R. 85. By way of example, she states that if she doesn't "write it down," she "won't know what it is." R. 85. Plaintiff explained that the morning of the hearing, she was unable to find the link to join the remote hearing on her phone despite previously believing that she had it. R. 88. She also stated that she does not drive a car because she "couldn't stay focused" when she once tried. R. 84. On one occasion when she tried, she "almost went off the guardrails" because "[t]he radio was a distraction." R. 84. When asked by the ALJ whether she could "sit down and keep track of [a] movie for the stories and the characters and the plot," she answered that she could not. R. 88. In addition, she stated that she has "severe depression," feels like people are "out to get [her]," and has "issue[s] with . . . anxiety." R. 85; *see also* R. 98. After the ALJ inquired about her triggers, Plaintiff replied that she is triggered by being in "small spaces" and she feels "very uneasy . . . being around a lot of people." R. 87.

A vocational expert, Lynn Paulson, testified at Plaintiff's hearing as well. The ALJ asked Paulson to assume an individual who "can perform simple, routine, repetitive tasks," "can sustain concentration, pace, and persistence for two-hour segments," "can have occasional interaction with supervisors, occasional noncollaborative interaction with coworkers, brief and superficial interaction with the public, with brief and superficial amounting to no more than 10% of the workday." R. 102. This individual also "requires work with little to no changes in duties or routines and no work requiring independent judgment making," which means "no sitting duties or schedules for others; no responsibility for the safety of others." R. 102. Furthermore, the ALJ asked Paulson to assume the individual is in a sedentary position. R. 102.

Paulson explained that some examples of work would be a "document preparer," "an addressing clerk," or a "touch-up screener." R. 103. When asked to consider the consequences if the individual "could not sustain concentration, pace, and persistence for two-hour segments" and would be "off task at least 15% of the workday," Paulson replied that "either singularly or in combination, that would preclude full-time, competitive work." R. 103. Paulson explained that the customary tolerance by employers for an employee to be off task is no more than 10% of the workday. R. 103. Moreover, Paulson explained that the customary tolerance for being absent is "no more than one absence per month, and that would include coming in late or leaving early." R. 104.

### 2. Mental Health History and Treating Doctor Assessments

#### i. Dr. Muvvala's Treatment and Assessments[3]

Dr. Srinivas Muvvala, M.D. is a psychiatrist affiliated with the Connecticut Mental Health Center ("CMHC"). R. 1650. Plaintiff began treatment with Dr. Muvvala on November 9, 2020, after she was referred by a probation officer.[4] R. 1650-51. Plaintiff continued treatment with Dr. Muvvala until at least July 26, 2022. R. 49. Dr. Muvvala admitted Plaintiff to the Substance Use and Addiction ("SATU") program at Yale School of Medicine and recommended therapy through SATU. R. 1651. Dr. Muvvala followed up approximately every

[3] The ALJ spelled Dr. Muvvala's name as "Dr. Muuvala" in his opinion. Based on the available treatment records, which uniformly refer to the doctor as "Dr. Muvvala," I conclude that the ALJ's spelling was an inadvertent error. R. 27. References to "Dr. Muvvala" in this opinion should be understood as references to the same individual as "Dr. Muuvala" in the ALJ's opinion.

[4] The Commissioner stated in his Statement of Material Facts that Plaintiff began treatment with Dr. Muvvala on October 1, 2020. Statement of Material Facts § 6, ECF No. 21-2. That appears to be an error. While Plaintiff's medical records from CMHC begin on October 1, 2020, her first session with Dr. Muvvala was dated November 9, 2020. R. 1651; *see also* R. 1738 (Dr. Muvvala's August 20, 2021 evaluation indicated that he began contact with Plaintiff on November 9, 2020.).

two weeks to one month with Plaintiff,[5] while LCSW Magalis Sandoval at CMHC provided weekly phone therapy for Plaintiff through SATU. *See* R. 1651 ("Writer [Muvvala] will f/u within two weeks."); R. 1657 (same); R. 1651 (Plaintiff was informed that she would be working with "Maggie"); R. 1652 (therapy with Sandoval scheduled for Tuesdays). Throughout Plaintiff's CMHC records, it is apparent that Sandoval and Muvvala communicated regarding Plaintiff's care. *See, e.g.*, R. 1658 (showing that Sandoval and "MD" at CMHC communicated concerning Plaintiff's social security matter); R. 1659 (Sandoval informed Plaintiff that MD would be informed of her concerns about Abilify side effects).[6] Dr. Muvvala was the prescribing doctor for Plaintiff's Aiblify prescription and other psychiatric drugs. R. 1656.

During Plaintiff's initial meeting with Dr. Muvvala, Plaintiff reported that she needed "help with [her] mental health." R. 1650. She reported that despite taking Lithium, she had "persistent mood instability." R. 1650. Dr. Muvvala reported that Plaintiff's mental status was: "Pleasant, cooperative, well groomed, normal speech, somewhat fast paced, mood anxious, affect somewhat labile, no psychosis, linear thoughts, Alert, fully oriented, decreased concentration, normal memory, I/J fair." R. 1650-51. Dr. Muvvala also assessed that Plaintiff had "chronic mood instability" and prescribed 5mg of Abilify. R. 1651.

---

[5] In Dr. Muuvala's August 20, 2021 mental residual functional capacity form, he indicated that he met with Plaintiff "once/month." R. 1738. However, based on the treatment notes, it appears that he interacted with Plaintiff more frequently.

[6] Later, additional providers affiliated with CMHC also worked with Plaintiff, including Cecilia Segura and Dr. Tanner Bommersbach. *See* R. 1882 (Segura began working with Plaintiff); R. 1897 (treatment report by Dr. Bommersbach).

The records of Plaintiff's sessions with Sandoval and Muvvala consistently record certain symptoms. First, the records consistently describe Plaintiff's struggles with depression. *See* R. 1658 (December 8, 2020, Sandoval, Plaintiff continued to struggle with "nightmares" and "anxiety," as well as "mania and depression."); R. 1659 (December 15, 2020, Sandoval, Plaintiff was depressed, having a hard time, and struggled with side effects of Abilify); R. 1660 (December 15, 2020, Dr. Muvvala, indicating depressed mood); R. 1709 (December 29, 2020, Dr. Muvvala); R. 1710 (January 6, 2021, Sandoval, Plaintiff continues to struggle with mood, although medication has helped stabilize mood); R. 1712 (January 13, 2021, Muvvala); R. 1715 (January 26, 2021, Sandoval); R. 1716 (February 2, 2021, Sandoval).

Second, the records consistently reference Plaintiff's "decreased concentration." R. 1656 (November 24, 2020, Dr. Muvvala); R. 1660 (December 15, 2020, Dr. Muvvala); R. 1709 (December 29, 2020, Dr. Muvvala); R. 1713 (January 13, 2021, Dr. Muvvala); R. 1715 (on January 26, 2021, Sandoval, Plaintiff appeared distracted).

And third, Plaintiff repeatedly described experiencing auditory and visual hallucinations. R. 1657 (December 1, 2020, Sandoval, Plaintiff said she had "auditory hallucinations"); R. 1711 (January 12, 2021, Sandoval, Plaintiff reported "demonic" and unclear auditory hallucinations).

On March 2, 2021, Plaintiff informed Sandoval, who in turn informed Dr. Muvvala, that Plaintiff was pregnant. R. 1863. Around the same time, reportedly five days before a March 3, 2021 conversation with Dr. Muvvala, Plaintiff stopped taking her medications because she felt her mood was stable. R. 1863-64. During this March 3, 2021 session, Dr. Muvvala recorded Plaintiff had "fair concentration" and a "euthymic" mood. R. 1864. A week later, on March 10, 2021, Dr. Muvvala recorded that Plaintiff had "fair concentration" again,

and that Plaintiff's mood was "okay." R. 1866. Two days later, on March 12, 2021, Dr. Muvvala recorded that Plaintiff's mood was "good" and that she had "fair concentration." R. 1868.

Dr. Muvvala conducted an assessment on March 17, 2021, which concluded that Plaintiff had poor ability to follow work rules, relate to co-workers, deal with public, use judgment, interact with supervisors, deal with work stress, function independently and maintain attention/concentration. R. 1731. She also had poor ability to carry out complex job instructions and detailed but not complex job instructions, poor ability to behave in an emotionally stable manner, relate predictabl[y] in social situations and demonstrate reliability. R. 1731. She had unstable mood, frequent mood swings, poor attention and concentration. She had frequent altercations with others. . . . The limitations to working included mood instability, poor concentration, chronic instability to maintain a job. R. 1732.

On March 19, 2021, Dr. Muvvala noted in a treatment report that Plaintiff had "good" mood and "fair concentration" again. R. 1870. On April 15, 2021, Dr. Muvvala reported that Plaintiff had "stable" mood on 5mg of Lexapro and once again had "good" mood and "fair concentration." 1873. The same reported by Dr. Muvvala again on June 8, 2021. R. 1878.

On, April 29, 2021, Dr. Muvvala completed a "mental residual functional capacity form" that stated that Plaintiff had Bipolar Disorder, chronic mood instability, thoughts of suicide, emotional liability, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, easy distractibility, and other symptoms. R. 1591-92. He also concluded that Plaintiff would be unable to meet competitive standards to remember work-like procedures, complete a normal workday and workweek without interruptions from

psychologically based symptoms, understand and remember detailed instructions, or carry out detailed instructions. R. 1593-94.

Plaintiff reported a "stable" mood from April 2021 through June 2021. R. 1872-80. But in July 2021, Sandoval described Plaintiff's struggles and fluctuations in mood. R. 1880-81. Sandoval was replaced by a new clinician, Cecilia Segura, on August 9, 2021.[7] R. 1882. During ambulatory services review on August 10, 2021, Dr. Muvvala recorded Plaintiff's "persistent depressed mood" and noted that Plaintiff requested an increased Lexapro dosage. R. 1883.

On August 20, 2021, Dr. Muvvala completed a "mental residual functional capacity form" that stated that Plaintiff had "severe depressed mood, poor concentration, poor sleep, anhedonia [and] worthlessness." R. 1738. Plaintiff also had decreased energy, thoughts of suicide, appetite disturbance, impairment in impulse control, perceptual or thinking disturbances, emotional liability, sleep disturbance, change in personality and generalized persistent anxiety. R. 1738-39. Dr. Muvvala indicated that Plaintiff was unable to meet competitive demands in the following areas: maintain concentration for 2 hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with a proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticisms from supervisors; get along with coworkers without unduly distracting them or exhibiting behavioral extremes; respond

[7] In this August 9, 2021 report by Sandoval, she indicates that the new provider's name is "Catherine Segura." R. 1882. Subsequent treatment reports by Segura clarifies that her name is actually "Cecilia Segura." *See, e.g.*, R. 1887.

appropriately to changes in a routine work setting; deal with normal work stress; and carry out detailed instructions. R. 1740. Dr. Muvvala indicated that Plaintiff marked difficulties maintaining concentration, persistence, or pace and had more than four episodes of decompensation. R. 1741. She would be absent more than 4 days per month. R. 1741.

#### ii. CMHC Treatment Records Following Dr. Muvvala's Assessments

Following Dr. Muvvala's August 20, 2021 assessment, Plaintiff's mood and concentration continued to fluctuate, and she continued to struggle with auditory hallucinations.

In her initial meeting with Cecilia Segura in August 2021, Plaintiff did not report any problems with mood. R. 1887. In October 2021, Plaintiff reported difficulties with mood to Segura, given that she was unable to take medications due to her pregnancy. R. 1890.

In a session with Segura on November 8, 2021, she reported that she had given birth to her baby and was doing "ok." R. 1891. On November 12, 2021, Dr. Muvvala reported that Plaintiff had an "anxious" mood and once again had "decreased concentration." R. 1892. That same week, on November 17, 2021, Plaintiff informed Segura that her medications were "not 'working for her'" and that she felt depressed given the recent passing of her mother. R. 1893. On November 19, 2021, Dr. Muvvala reported that Plaintiff's mood was "dysphoric" and once again had "decreased concentration." R. 1894.

On January 11, 2022, Plaintiff reported feeling overwhelmed caring for her baby, but "denie[d] significant depression," to Dr. Tanner Bommersbach, a new provider for her at CMHC. R. 1897. In February 2022, Plaintiff reported to Segura stable mood but continued

feeling overwhelmed caring for her infant. R. 1899. At the end of the month, on February 28, 2022, Dr. Bommersbach reported that Plaintiff had an "anxious" mood. R. 1900.

In the records Plaintiff subsequently provided to the Appeals Council (but not reviewed by the ALJ), there remained indications that Plaintiff's mood dipped despite its relative stability following the birth of her child. For example, in March 29, 2022, Dr. Bommersbach reported Plaintiff "[c]ontinues to feel overwhelmed and anxious at times with all of the caretaking demands on her with her newborn baby." R. 39. On May 11, 2022, Plaintiff reported that she was "going 'through a lot.'" R. 41. And less than a month later, on June 6, 2022, Plaintiff "stated that lately she has been experiencing depression, anxiety and the returning of voices," about which she stated, "I can not really explain how they are but I hear them." R. 42. In an assessment two days later, on June 13, 2022, Plaintiff reported that she has been feeling "more 'overwhelmed,'" that she has "increased anxiety and depression," and that "she has begun hearing voices in the evenings," although she "cannot make out what the voices are saying." R. 42. She also described having "racing thoughts and difficulty concentrating." R. 42. On June 28, 2022, Dr. Muvvala recorded that Plaintiff was "anxious" and heard voices. R. 44. In September and October of 2022, Plaintiff reported an "angry and anxious" mood followed by some improvement. R. 51-52.

**iii. Dr. Uvadu's Assessment**

Dr. Olivetta Uvadu, another provider with SATU, met with Plaintiff monthly for two years. R. 1743. The specific contents of the treatment meetings are not contained in the record, but it is apparent the appointments were in the context of the SATU program and CMHC. R. 1747; R. 52 (Segura noted that Plaintiff would be meeting with "Dr. Olivetta."). It is unclear why the ALJ did not obtain Plaintiff's treatment records from Dr. Uvadu.

On September 19, 2022, Dr. Uvadu completed a mental residual functional capacity questionnaire that stated: Plaintiff had Bipolar Disorder, "poor concentration, poor sleep, low mood with anhedonia and worthlessness, [and] auditory hallucinations." Plaintiff's prognosis was "long term and chronic." R. 1743. Plaintiff also had decreased energy, perceptual or thinking disturbances, hallucinations or delusions, emotional liability, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, easy distractibility, memory impairment, sleep disturbance, recurrent severe panic attacks, flight of ideas, among other symptoms. R. 1743-44. Dr. Uvadu further concluded that Plaintiff had "limited but satisfactory" ability to remember work-like procedures, understand and remember very short and simply instructions, and carry out very short and simply instructions. R. 1745. Dr. Uvadu concluded, by contrast, that Plaintiff would be unable to maintain attention for two hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. R. 1745. Dr. Uvadu further concluded that Plaintiff had "marked" "difficulties in maintaining concentration, persistence, or pace." R. 1747.

**B. The ALJ's Decision**

The ALJ found that Plaintiff suffers from chronic right knee ACL Tear, Hepatitis C, Obesity, and Bipolar Disorder. R. 21. At step three in the sequential analysis, the ALJ found that these impairments "significantly limit [Plaintiff's] ability to perform basic work activities." R. 21. But the ALJ rejected Plaintiff's arguments that her conditions "equal[ ] the

severity of one of the listed impairments." R. 21.[8] Proceeding to step four, the ALJ concluded that Plaintiff had no relevant past work. R. 30.

The ALJ assessed Plaintiff's mental functional limitations[9] as follows:

1. Understanding, remembering or applying information: mild limitation.

2. Interacting with others: moderate limitation.

3. Concentrating, persisting or maintaining pace: moderate limitation.

4. Adapting or managing oneself: moderate limitation

R. 21-22.

The ALJ applied these functional limitations to conclude that Plaintiff possesses the following RFC:[10]

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except: The claimant requires a sit/stand option wherein she sits for 30 minutes, alternates to a standing position for five minutes, and then resume sitting. The claimant may never climb ladders, ropes, or scaffolds. The claimant may occasionally climb stairs/ramps, balance, stoop, and crouch. The claimant may never kneel/crawl. The claimant may perform occasional overhead reaching. The claimant should have no work in exposure

[8] Where, as here, the ALJ concludes at step three that the claimant's impairments fail to meet or equal the severity of one of the listings in the SSA's "Listing of Impairments," the ALJ must move to step four and determine whether, in light of the claimant's impairments, the claimant has the residential functional capacity to perform any of their past relevant work. *Nunez v. Comm'r of Soc. Sec.*, 164 F.4th 60, 67-68 (2d Cir. 2025).

[9] An ALJ analyzes four areas of mental functioning: "[1] [u]nderstand, remember, or apply information; [2] interact with others; [3] concentrate, persist, or maintain pace; and [4] adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3). Each area of mental functioning is ranked on a five-point scale: "[n]one, mild, moderate, marked, and extreme." *Id.* § 404.1520a(c)(4). A person experiencing a mental disorder is considered disabled if the disorder "result[s] in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(2)b.

[10] "[A]n individual's RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (citation modified).

> to cold/rain environments. The claimant should avoid concentrated exposure to pulmonary irritants. The claimant can perform simple, routine, repetitive tasks. The claimant can sustain concentration, persistence, and pace for two-hour segments. The claimant may have occasional interaction with supervisors and occasional, non-collaborative, interaction with coworkers. The claimant may have brief and superficial (no more than 10%) of the workday interacting with the public. The claimant should have work with little/no changes in duties/routines. The claimant should have no work requiring independent judgment (no setting duties/schedules for others, no responsibility for the safety of others).

R. 23.

At step five, the ALJ relied on the testimony of a vocational expert to conclude that there are jobs in the national economy that Plaintiff could perform. R. 31.

### C. Procedural History

Plaintiff filed the Complaint in this action *pro se* on November 13, 2023. ECF No. 1. On January 16, 2024, the Commissioner filed the administrative record. ECF No. 12. On January 25, 2024, the Commissioner filed the searchable, unofficial copy of the record. ECF No. 15.

On April 24, 2024, Plaintiff filed her Motion to Remand. ECF No. 19. The Commissioner filed a Motion to Affirm on May 28, 2024. ECF No. 21. This case was transferred to me on January 6, 2025.[11] ECF No. 22.

## II. <u>LEGAL STANDARD</u>

"Congress has authorized federal courts to engage in limited review of final SSA disability benefit decisions." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,

[11] This case was first assigned to the Honorable Michael P. Shea and was transferred to the Honorable Kari A. Dooley on December 4, 2023. ECF No. 11.

shall be conclusive." 42 U.S.C. § 405(g). "The phrase substantial evidence is a term of art used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citation modified). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schillo*, 31 F.4th at 74 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence is a very deferential standard of review." *Nunez v. Comm'r* of Soc. Sec., 164 F.4th 60, 70 (2d Cir. 2025) (citation modified). "Indeed, under the substantial evidence standard, the SSA's determination must be upheld if it is rational and supported by the record, even if the evidence is susceptible to more than one rational interpretation." *Id.* (citation modified).

Plaintiff is representing herself in these proceedings. "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Consistent with this duty, the "submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation modified).

## III. <u>DISCUSSION</u>

Construed liberally, I understand Plaintiff to argue that the ALJ erred in (1) determining Plaintiff's mental residual functional capacity ("RFC") and (2) concluding that Plaintiff is capable of sedentary work with additional postural and environmental limitations. Plaintiff can also be fairly read to argue that the Appeals Council erred in affirming the ALJ's decision.

### A. Mental RFC

As I explain, I am persuaded that the ALJ lacked substantial evidence to reject the assessments by Plaintiff's treatment providers. In the same vein, I conclude the ALJ lacked substantial evidence to support the mental RFC determination.

#### 1. ALJ Consideration of Treating Doctor Opinions

Consistent with my duty to read Plaintiff's filings "to raise the strongest arguments that they suggest," *see Triestman*, 470 F.3d at 474, I understand from Plaintiff's citations to her treating physicians' medical opinions that she argues that the ALJ failed to accord sufficient weight to her treating physicians' opinions.

"Under the SSA, the ALJ must determine whether to credit or reject a particular medical opinion by evaluating two main factors: (1) 'supportability,' i.e., how well the objective medical evidence and explanations given support the medical source's conclusions; and (2) 'consistency,' i.e., how consistent the opinion is with the rest of the record." *Nunez*, 164 F.4th at 73; 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5); 416.920c(a), (c)(1)-(5).[12]

##### a. Dr. Uvadu

The ALJ noted that Dr. Uvadu concluded that Plaintiff would be absent more than four days a month and would have marked limitations in maintaining concentration, persistence, or pace. R. 28. The ALJ found this conclusion was "not persuasive" as Dr. Uvadu "identified symptoms not seen in the record and therefore unsupported: particularly hallucinations, poor concentration, and perceptual disturbances." R. 28. The ALJ found that "her treatment record

[12] Because Plaintiff brought her claim after March 27, 2017, the ALJ properly declined to "defer or give any specific evidentiary weight, including controlling weight," to the opinions of Plaintiff's treatment providers. 20 C.F.R. § 404.1520c(a); *cf. Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022) (defining the treating physician rule).

specifies the lack of these issues." R. 28; *see* R. 1743-48 ("Medical Assessment Mental Ability-Work Related Activities" by Dr. Uvadu).

When the ALJ refers to "her treatment record," it is unclear if the ALJ is referring to Dr. Uvadu's own records of treating Plaintiff or to Plaintiff's treatment records as a whole. With respect to Dr. Uvadu's own records of treating Plaintiff, such records do not appear in the record before me, indicating that the ALJ did not obtain them. Accordingly, the ALJ could not have known whether Dr. Uvadu's identification of hallucinations, poor concentration, and perceptual disturbances were supported by Dr. Uvadu's records. To the extent the ALJ was referencing Plaintiff's treatment records as a whole, those records contain numerous references to such symptoms as of the date of Dr. Uvadu's assessment, September 19, 2022. *See, e.g.*, R. 1656, 1660, 1709, 1713, 1715, 1892, 1894 (assessment of "decreased concentration" or trouble focusing); R. 1657, 1711 (recording auditory hallucinations).

The ALJ further noted that Dr. Uvadu's assessment also made "indications for inability to sustain attention for two-hour segments or maintain regular attendance or perform at consistent pace," which the ALJ concluded lacked "correspondence with the treatment notes." R. 28. Again, the ALJ did not have Dr. Uvadu's "treatment notes," and in any case, there are numerous references in the treatment notes of other clinicians regarding Plaintiff's decreased concentration. Indeed, elsewhere in the opinion, the ALJ recognized Plaintiff had "moderate limitations" in concentration, persistence, and pace. R. 22. There is no discrepancy or inconsistency between Dr. Uvadu's assessment concerning Plaintiff's inability to "sustain attention for two-hour segments" or maintain regular attendance and pace and the treatment record as a whole. The record amply supports Dr. Uvadu's opinion that Plaintiff struggles with concentration.

In addition, the ALJ faulted Dr. Uvadu for not recognizing any improvement in Plaintiff's mood, yet the ALJ failed to explain how an improvement in mood necessarily would help Plaintiff's concentration. Moreover, by September 2022, Plaintiff was again reporting that she felt overwhelmed caring for her infant, felt anxious, and was hearing voices. R. 39, 42, 44. Finally, as noted, the ALJ was not in a position to assert that Dr. Uvadu's assessment was not supported by Dr. Uvadu's records regarding treatment of Plaintiff—because the ALJ did not obtain Dr. Uvadu's treatment records.

Before rejecting Dr. Uvadu's opinion for lack of supportability, the ALJ should have obtained Plaintiff's records of treatment with Dr. Uvadu. The ALJ's finding that Dr. Uvadu's assessment lacked supportability with respect to the treatment notes of other providers is contradicted by the record.

The ALJ also found Dr. Uvadu's assessment to have low consistency, as Dr. Uvadu's opinion was "inconsistent with the opinions of the State agency psychological consultants who found that the claimant could perform short and simple tasks and that she can sustain concentration, persistence, and pace for such tasks." R. 29. As noted, Dr. Sells and Dr. Hanson found that Plaintiff's "judgment is intact for safety and simple decisions," and that Plaintiff would be able to "perform work-related tasks for 2-hour periods in an 8-hour workday." R. 118, 130. The ALJ found that these opinions were "somewhat persuasive," as they "supported their opinions with detailed explanations of the relevant clinical evidence, made available to them, and the consistency of their opinions with the other evidence from other sources." R.

29.[13] But Dr. Sells and Dr. Hanson, unlike Plaintiff's treating doctors, did not independently examine Plaintiff, and there is ample evidence available in the treatment records supporting Dr. Uvadu's assessment that Plaintiff struggled with concentration and struggled with hallucinations. Moreover, Dr. Sells and Dr. Hanson recognized that Plaintiff had limitations in concentration, persistence, and pace and did not opine on how often Plaintiff would be off task during a workday.

Therefore, I conclude that the ALJ's finding that Dr. Uvadu's assessment lacked supportability and consistency, and was therefore not persuasive, is not supported by substantial evidence. Remand is warranted for the ALJ to obtain Dr. Uvadu's treatment records and reevaluate Dr. Uvadu's opinion.

**b. Dr. Muvvala**

The ALJ found that Dr. Muvvala's April 2021 and August 2021 "opinions are not entirely persuasive, as the findings reflect the claimant's mental status as she began treatment," which did "not align with the later treatment records showing improvement and mood stability." R. 27; *see* R. 1730-47 (two Mental RFC Assessments by Dr. Muuvala). The ALJ stated that "[t]he indications for inability to remember work-like procedures, maintain attention for 2-hour segments, or maintain regular attendance do not align with the later treatment records showing improvement and mood stability." R. 27.

The ALJ also noted that in Dr. Muvvala's March 2021 assessment, Dr. Muvvala "indicated that the claimant had unstable mood, frequent mood swings, poor

[13] In addition, I note that the two doctors provided identical assessments, with each a verbatim copy of the other.

attention/concentration, and frequent altercations with others." R. 28. The ALJ found this opinion "not entirely persuasive," as, according to the ALJ, Dr. Muvvala's "notations for poor ability to follow work rules, maintain attention/concentration, use judgment, or function[] independently do not agree with the content of the treatment notes from this same source" which showed that claimant has "'good' mood, linear thoughts, and fair concentration." R. 28. The ALJ cited to Dr. Muvvala's treatment notes from March 19, 2021, which indicated the following for Plaintiff's "Mental Status" on that date: "Pleasant, cooperative, speech normal, mood 'good', no psychosis, linear thoughts, Alert, fully oriented, fair concentration, normal memory, I/J fair." R. 1870. The ALJ found that these discrepancies "reduce[d] the probative value of the findings contained" in Dr. Muvvala's mental RFC assessment. R. 28.

The ALJ correctly observes that Plaintiff reported an improved mood at times during her treatment at CMHC. However, given the "cyclical nature" of many mental health conditions, the Second Circuit has "regularly caution[ed] against rejecting medical opinions" based on the basis of "sporadic improvement." *Nunez*, 164 F.4th at 74-75 (citation modified); *see also Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) ("Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.") (citation modified); *Colgan v. Kijakazi*, 22 F.4th 353, 362 (2d Cir. 2022).

Moreover, the ALJ did not explain how an improvement in mood necessarily means an improvement in the ability to "remember work-like procedures" or "maintain attention for 2-hour segments." Although Dr. Muvvala recorded "fair concentration" beginning in March 2021, the treatment notes from before that date consistently recorded "decreased

concentration." R. 1651, 1656, 1660; R. 1709, 1713, 1715. Those treatment records also showed that Plaintiff experienced auditory hallucinations. R. 1657, 1711. Notably, after recording "fair concentration" for several months, Dr. Muvvala again recorded "decreased concentration" in November 2021. R. 1892, 1894.[14] In addition, it is not evident that a reference to "linear thoughts" and "fair concentration" necessarily contradicts a contemporaneous assessment that the patient has a "poor ability to follow work rules, maintain attention/concentration, use judgment, or function[] independently." *See* R. 28.

The ALJ concluded that Dr. Muvvala's opinions had low consistency, as they were "inconsistent with the opinions of the State agency psychological consultants who found that the claimant could perform short and simple tasks and that she can sustain concentration, persistence, and pace for such tasks." R. 28. As discussed, Dr. Sells and Dr. Hanson, unlike Plaintiff's treating doctors, did not examine Plaintiff, and thus their conclusions were based on a review of Plaintiff's medical records. The treatment records support Dr. Muvvala's assessment that Plaintiff struggled with concentration. In fact, in addition to the parts of the record that Dr. Muvvala considered in forming his conclusions, the parts of the record that were not yet available to Dr. Muvvala at the time of his assessments further bolster his conclusions. R. 1892, 1894 (treatment notes recorded by Dr. Muvvala showing Plaintiff's "decreased concentration" in November 2021).

[14] Dr. Muvvala would not have had the benefit of his November 12, 2021, visit with Plaintiff when preparing his assessments. Nevertheless, the record shows that intermittent improvements in an individual's mental status does not necessarily indicate that the individual no longer suffers from a particular condition. *Nunez*, 64 F.4th at 75; *Estrella*, 925 F.3d at 97.

Based upon my searching and independent review of the record, I conclude that the ALJ's assessment of Dr. Muvvala's assessment opinion was not supported by substantial evidence.

### 2. ALJ's RFC Conclusions Are Not Supported By Substantial Evidence and Require Further Development

I am also persuaded that the ALJ erred with respect to his determination that Plaintiff has a "moderate" limitation with respect to maintaining concentration.

The ALJ determined that Plaintiff had various mental limitations. R. 22. Citing records from October 2020 and January 2021, the ALJ observed that "[m]ental status findings remained for . . . decreased concentration." R. 22. The ALJ concluded: "The undersigned accepts that the claimant has some limitations with focus/attention." R. 22. However, despite acknowledging Plaintiff's limitation in her ability to concentrate, persist, or maintain pace, the ALJ then concluded that Plaintiff had the RFC to sustain concentration, persistence, and pace for two-hour stretches while performing simple, repetitive, and routine work. R. 23. The RFC contains the implicit conclusion that Plaintiff would not be off task for more than 10% of the workday or miss more than one day of work a month, as the vocational expert testified that such limitations would preclude Plaintiff from maintaining any employment.

In formulating the RFC with respect to concentration, persistence, and pace, it appears the ALJ relied on the decisions of the state agency psychological consultants, who opined that Plaintiff could sustain concentration, persistence, and pace for short and simple tasks. R. 29. The ALJ discounted Plaintiff's testimony that she had little ability to focus for work tasks because "there are no findings of loss of cognitive ability." R. 26.

As the Second Circuit recently explained, although remand is not required if "the evidence of record permits us to glean the rationale of an ALJ's decision," remand *is* required if the record contains no justifications for the ALJ's RFC conclusions. *Nunez*, 164 F.4th at 71 (citation modified). In *Nunez*, the ALJ concluded that the plaintiff was able to sustain a work routine, with specific limitations, despite finding that the plaintiff had "moderate limitation" with "concentrating, persisting, or maintaining pace." *Id.* In drawing such a conclusion, the ALJ in *Nunez* implicitly concluded that the plaintiff "would not be off task more than 10% of the workday or miss more than one day of work per month," as the vocational expert testified was necessary for him to maintain employment. *Id.* The Second Circuit concluded that remand was necessary given that the ALJ's RFC determination, and implicit findings, required "further record development," as the record provided no support for the ALJ's RFC conclusions. *Id.* (concluding that review of the record did not reveal "*any* justification for the ALJ's RFC determination, particularly with respect to its implicit conclusion that Nunez would not be off task more than 10% of the workday or miss more than one day of work per month").

Here, as in *Nunez*, the ALJ failed to explain how Plaintiff's "moderate limitations" with respect to her "ability to concentrate, persist, or maintain pace" are consistent with the RFC. R. 22. Moreover, the ALJ never discusses the ways in which Plaintiff's daily auditory hallucinations (and at least occasional visual hallucinations) may impact her ability to maintain concentration at work. As discussed, Plaintiff's testimony and records show that Plaintiff consistently struggled with concentration. Although both of Plaintiff's treating doctors opined that Plaintiff would not have the ability to sustain concentration, persistence, and pace for two-hour stretches, the ALJ rejected those opinions.

The ALJ recognized that Plaintiff "reported having very little ability to focus for work tasks," but found "these allegations to underestimate the claimant's functional ability" because "there are no findings for loss of cognitive ability such that the claimant could not perform at least short and simple tasks." R. 26. But the ALJ does not explain why difficulty with concentration or focus must originate only from diminished "cognitive ability."

In addition, like the medical experts in *Nunez*, Dr. Uvadu found that Plaintiff would be absent from work "more than four days per month due to her symptoms and she would have marked limitations in maintain concentration, persistence, or pace." R. 27-28. Dr. Muvvala also concluded that Plaintiff had "poor attention/concentration," and Dr. Uvadu found that Plaintiff had "poor concentration and perceptual disturbances." R. 28. Both doctors specifically said that Plaintiff could *not* maintain concentration, persistence, and pace for two hour stretches. R. 27, 28. The doctors' assessments were supported by the treatment notes and were consistent with the rest of the record. There is no substantial evidence supporting the ALJ's contradictory conclusion that Plaintiff could remain on task for 90% of the workday and could maintain concentration, persistence, and pace for two hour stretches.

Furthermore, and relatedly, while recognizing that Plaintiff has "persistent symptoms of auditory and visual hallucinations," the ALJ does not discuss how the RFC accounts for these symptoms. R. 25-26. Although the ALJ concludes Plaintiff has no "loss in cognitive ability" and is able to "perform at least short and simple tasks," R. 26, the ALJ does not explain how he concluded that Plaintiff was able to accomplish such tasks—and maintain concentration, persistence, and pace—in spite of her hallucinations.

The ALJ correctly observes that Plaintiff reported an improvement in mood at various times during the course of her treatment. However, the ALJ appears to conflate Plaintiff's

ability to concentrate with her mood, stating that "[t]he indications for inability to remember work-like procedures, maintain attention for 2-hour segments, or maintain regular attendance [reflected in Dr. Muuvala's assessments] do not align with the later treatment records showing improvement and mood stability." R. 27. As noted, an improvement in mood stability is not necessarily inconsistent with an inability to concentrate or maintain a regular work schedule. And as noted, Plaintiff's treatment records continued to explicitly report trouble with focus and attention. R. 1892, 1894

Finally, the ALJ's conclusions relied on the State agency psychological consultants, Dr. Sells and Dr. Hanson, whose assessments the ALJ found "somewhat persuasive." R. 29. The ALJ states that based on the state consultants' assessments, he "accepts that the claimant can perform short and simple tasks and that she can sustain concentration, persistence, and pace for such tasks." R. 29. The two consultants' assessments state that the Plaintiff "is able to perform work-related tasks for 2-hour periods in an 8-hour workday." R. 118, 130. Yet both consultants recognize Plaintiff has "sustained concentration and persistence limitations" and neither speaks to whether she will be off task for more than 10% of the workday.

Therefore, I conclude that there is not substantial evidence supporting the ALJ's mental RFC conclusion that Plaintiff has the ability to sustain concentration, persistence, and pace for two-hour stretches while performing simple, repetitive, and routine work—and the implicit conclusion that Plaintiff would not be off task for more than 10% of the workday or miss more than one day of work a month. Remand is necessary for additional record development and explanation for the ALJ's conclusion.

### B. Sedentary Work RFC

Plaintiff also contests the ALJ's determination that she has the RFC to complete sedentary work. As evidence, she points only to her own statements at the hearing about her right knee, R. 97, and a record from a physical exam on November 5, 2020 finding tenderness, limited knee flexion, and an inability to squat with her right knee. R. 1564-66.

In his decision, the ALJ acknowledged this injury, described Plaintiff's testimony about her inability to touch her toes or squat, and noted that "around Christmas 2021" Plaintiff tore her right knee ACL. R. 24. He also noted Plaintiff's testimony about using a right-knee brace. R. 24. But the ALJ found that Plaintiff's statements about the "intensity, persistence and limiting effect of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 24. The ALJ did not credit Plaintiff's testimony that she had limited exertional capacity or problems with ambulation as a result of the right knee injury. R. 24. Critically, he found that "[t]here are no findings for loss of upper body strength taking the claimant out of the scope of the RFC." R. 25.[15]

In reviewing the medical records, the ALJ noted that in July 2019, during a comprehensive physical examination, Plaintiff had full range of motion. R. 25. He also noted that in March 2020, Plaintiff reported that she had "injured her knee jumping from a wall" and reported "chronic knee problems." R. 25. The examination showed pain with right hip flexion and extension, although an x-ray showed negative. R. 25. The ALJ further found that Plaintiff's

[15] Plaintiff testified at the hearing that she struggled to sit for longer than fifteen minutes at a time. *See* R. 92. However, by contrast to other portions of Plaintiff's testimony, the ALJ does not reference Plaintiff's testimony concerning her inability to sit comfortably for more than fifteen minutes, nor does he reconcile her testimony with his finding that she would be able to sit for thirty minutes at a time. The ALJ is instructed, on remand, to make explicit findings concerning this portion of Plaintiff's testimony.

knee pain persisted through November 2020, at which point Plaintiff reported "right knee pain following a fall/twist in January 2020" which led to chronic pain and swelling. An MRI showed a "complex tear of the posterior horn of the medical meniscus and complete tear of her ACL."[16] R. 25. Referred to an orthopedic surgeon, Plaintiff was found to have a non-antalgic gait. R. 25.

The non-examining state agency medical consultants found that Plaintiff "could perform Light Work with limited ability to stand/walk." R. 29. The ALJ, however, found that the state agency consultant opinions were only "partially persuasive" because they were not consistent with record establishing Plaintiff's chronic pain, intermittent swelling, and non-antalgic gait, and the results of the MRI. R. 29. Instead, the ALJ accepted "that the [Plaintiff] has some limitations" and found that she had the RFC for sedentary work, with a sit/stand option and "environmental requirements for no work in exposure to cold/rain environment or in concentrated exposure to pulmonary irritants." R. 24.

I can see no legal error on the part of the ALJ here. He evaluated all of the medical records, including the Plaintiff's treatment history, testimony, and the state agency consultant opinions. He found that the consultant opinions were partially persuasive, to the extent that they were supported by the clinical records and Plaintiff's testimony, and having made these findings on the record after explaining his reasoning, he was entitled to rely on these opinions. *Ferrara*, 2021 WL 1239948, at *7. Other than her testimony, Plaintiff has not submitted any evidence demonstrating that she could not perform the requirements of sedentary work.

[16] The ALJ also stated that "[n]otably, the claimant's right knee ACL tear did not occur until January 2020." R. 25. It is unclear whether the ALJ has concluded that this ACL tear was the same as, or related to, the one which Plaintiff testified occurred around Christmas 2021.

I therefore find that the ALJ's decision was supported by substantial evidence, and I affirm the ALJ's decision as to a finding of sedentary RFC.

### C. Other Claimed Errors

On remand, and after considering the new evidence, the ALJ shall consider the other claims of error not discussed in this decision. *Pacheco v. Saul*, No. 3:19-CV-00987 (WIG), 2020 WL 113702, at *8 (D. Conn. Jan. 10, 2020) ("On remand, the Commissioner will address the other claims of error not discussed herein."). In particular, consider the medical records made available to the Appeals Council after the ALJ issued his previous decision. *See* R. 36-69.

## IV. CONCLUSION

For the foregoing reasons, I grant Plaintiff's Motion to Reverse the Commissioner and deny the Commissioner's Motion to Affirm. The Clerk of Court is respectfully directed enter judgment in favor of Plaintiff and close this case.

**SO ORDERED.**

New Haven, Connecticut
September 30, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge